Counsel, the docket sheet has an entry next to your name that says confirm this because I guess we're not quite sure of your last name, the spelling and pronunciation. So what is it? That's my mistake. I should have taken that out. That's all right. That's no problem. Well, I'll pronounce it. Good morning. May it please the Court. My name is Victoria Chagin. Chagin. Spelled C? With two H's. Two H's. Very good. All right. Thank you. And I represent the appellant Christopher Floyd. I'd like to reserve three minutes for rebuttal, please. You may do so. And I'd like to address only three of the issues that were in the briefing. Could you speak a little closer to the microphone, please? Sure. Maybe you can pull it closer. I'd like to address only three of the issues that were in the briefing, two of the medical opinions and the step four decision on past relevant work. The first issue I'd like to talk about stems from the misunderstanding of the negative symptoms of schizophrenia. In cases that administrative law judges typically see, negative signs or symptoms refer to an absence of symptoms, such as in back conditions or even in drug cases. Positive symptoms refer to the existence or the confirmation of an impairment. The ALJ seems to have applied that reasoning here in schizophrenia. However, it's very different. Positive symptoms of schizophrenia are the types of symptoms we typically as lay people associate with schizophrenia, the psychotic symptoms, the hallucinations, the delusions. The negative symptoms, however, refer to a lack or absence of personality traits, such as apathy or, for example, loss of unprompted speech, interest or drive or affect, a very flat. Is that enough to establish schizophrenia? There needs to be a combination of positive and negative symptoms for a diagnosis of schizophrenia, which is what the treating psychiatrist, excuse me, in this case found. Mr. Floyd was diagnosed with schizophrenia in his mid-20s, which is typically when schizophrenia is diagnosed, and particularly in males. And he was having most of the symptoms, hearing the voices of God and the devil, hallucinations, and this was reported by his father to the psychiatrist. He was prompted to go see a doctor. With medication, strong antipsychotic medications, the overt symptoms, the psychotic symptoms, seemed to have been alleviated for the most part, with the exception of some paranoia. However, he was left with a lot of the negative symptoms, the apathy, the social withdrawal. And this ended up being a battle for him throughout the record of trying the psychotic medications, becoming very lethargic, withdrawing, going off the medications, and having psychotic symptoms, including paranoia. It appears, I guess it's pretty clear that the ALJ misunderstood what this negative symptomatology meant. Yes. Okay, what's the significance of that then? So we now know that he misunderstood that. Where do we go from there? Okay, well, the significance of that, that was his primary reason for rejecting the sole treating psychiatrist's opinion. And according to Social Security's regulations, there were lots of reasons why this particular medical source was entitled to great weight, if not controlling weight. The long-term nature. There's no doubt that he has schizophrenia, right? There's no doubt that he has schizophrenia, but he rejected the marked impairments that Dr. Lenz identified. As I understood it, because he misunderstood what negative symptomatology meant in Dr. Lenz's notes, he disregarded Dr. Lenz's opinion that there were these impairments and restrictions. Exactly. He ended up rejecting his opinion about the functional limitations that the impairment caused. And he even doubts the diagnosis. In his findings, he says possible schizophrenia, not actual schizophrenia. The DOJ found that he could still be a dishwasher. Yes. He came up with three of the past relevant jobs that Mr. Floyd had performed in the past. The first was fire watch, and what's involved in a fire watch is watching a welder and making sure that nothing around the welder catches fire. It's a boring job. And Mr. Floyd, who was almost obsessively intent on going back to work, tried to do this job again, and he fell asleep and he was fired. He also tried to work as a fast food grill cook, which he had done in the past at McDonald's. He was fired from that job as well. He was unable to perform that job. Was it mental illness? The reasons were a little bit different. He was getting into arguments with his coworkers and supervisors, and he was having a lot of problems with pace, which is a very significant limitation in this case, because most of the types of jobs that we're looking at, unskilled, which don't involve a lot of contact with others, would involve some amount of production or pace work. He was unable to do that. He tried twice. He worked at Kentucky Fried Chicken and he worked at McDonald's. And in both cases, he was unable to do the work. Was that a function of his illness? Yes, as a function of his illness and the medications he was taking. Who testified it was a function of his illness? He did. He described his work and then the administration. Was he mentally ill to work at McDonald's? I mean, does that affect what he testified? Yes, he testified that this is why he was fired. He was fired because he couldn't keep up with the work. And the administrative law judge at Step 4 is required to consider the testimony of the claimant. And he didn't consider it. He didn't seem to consider that at all, which is the third error that I was hoping to address. The Step 4 finding requires a lot of very specific findings. You can't just say the administrative law judge can't just say the individual can go back and perform this work. He has to make certain findings. He has to determine whether it's substantial gainful activity. And in order for a job to be substantial gainful activity, the individual has to have been able to perform it. And here, the fast food grill cook job and the fire watch job, he was not able to perform. So it's difficult to say that those were really substantial gainful activity. Counsel, I have a question on the LENSA issue. Sure. What is REY testing? What is that? That's a malingering test. That's a test that's administered to see if people are falsifying their symptoms. Typically, it's for people who are malingering, who are pretending to be more impaired than they are. The consultative examiner and the treating psychologist found that, if anything, Mr. Floyd was overstating his symptoms, was pretending to be doing better than he was doing, in fact, which is a problem in this case. And Dr. Niemes, the examining psychologist, thought that this case should be developed a little bit more so that it could be determined, including interviews with parents or other people in Mr. Floyd's life, to determine what is he exactly experiencing because he has a tendency to deny the hallucinations and the delusions. Counsel, you're below three minutes. It's up to you. I think I'd just like to conclude at this point by saying that because of the past relevant work error, not making the necessary findings, rejecting the one main source, the treating psychiatrist, and the consultative examiner's opinion, that it can't be said that there was substantial evidence to support the administrative law judge's decision in this case. Thank you, counsel. Mr. Bloom. Good morning, Your Honors. May it please the Court. David Bloom for the Commissioner. I'd first take issue with the characterization of the rejection of Dr. Lenz's opinion. Plaintiff's counsel said that the sole or primary reason the ALJ rejected it was because of the misunderstanding over negative symptomatology. Nowhere does the ALJ say that that's his primary reason for rejecting Dr. Lenz's opinion. In fact, it was one of several reasons. He didn't list it first. He didn't say it was the most important reason for rejecting Dr. Lenz's opinion. In fact, the first reasons he gave for rejecting that opinion were, one, that the ultimate disability opinion was inconsistent with Dr. Lenz's actual treatment notes during the relevant period, which by treatment notes, isn't he referring to the treatment notes of negative symptomatology? It could be. That's only part of it. So how do we know he would have rejected Dr. Lenz's testimony if he had properly assessed what negative symptomatology was? Because of this. If he proceeded on a total misconception that negative symptomatology means the guy is malingering and doesn't have symptoms, shouldn't we send it back and say here's what negative symptomatology means now? You know, make your ruling in light of that. No, I wouldn't go that far. I don't think the misunderstanding was that extensive to support that interpretation of the record. He didn't find the plaintiff was malingering. In fact, he accepted some kind of schizophrenia impairment, found it severe, and adopted restrictive limitations from it. He also adopted the opinion of the state agency reviewing psychologists who presumably do know what schizophrenia is and what negative symptomatology is. He adopted their functional limitations. So there's a medical expertise to back up the ALJ's opinion. And also what I was getting at in the treatment notes, often Dr. Lenz indicated the plaintiff was doing better, improving, lack of symptoms and lack of a lot of symptoms. And Dr. Lenz himself was uncertain about schizophrenia. So when it was stated that there was, that everyone was clear that Mr. Floyd had schizophrenia, that's not necessarily so. Dr. Lenz's own diagnosis changed over time. At one point he said probable schizophrenia. He said possible schizophrenia. In one report he indicated that he couldn't really solidify the diagnosis of schizophrenia. So to fault the ALJ for some skepticism or at least uncertainty about it, he lies to the record. Counsel, the ALJ, after referring to ray testing of malingering behavior, he also refers to negative impression management. What does that mean? I'm not sure what the ALJ was referring to. It could be trying to portray yourself as. Well, the context is that it goes on to say that inference of schizophrenia from Floyd's lack of symptoms is not supported by later saying, and I quote, ray testing of malingering behavior. We know what that is now. Or negative impression management. Well, I mean, the ALJ thought that Dr. Lenz had overstated the extent of plaintiff's schizophrenia, and I think he was simply trying to say that there's no indication that the plaintiff was overstating his symptoms. If I understand their argument, it's that his mental illness keeps him from holding a job and causes him to be fired. And if I understand the ALJ correctly, he found there were other reasons why Mr. Floyd was fired. Can you discuss that? Yes, that's a good point. And I wanted to address that issue because a central part of the ALJ's rationale is that it is not the case here that plaintiff's mental impairment caused him to lose all of these jobs. It may have caused him to lose some. But in addition, the ALJ emphasized that there was a volitional component to plaintiff's loss of jobs in the past. For example, at McDonald's, it's not true that he was fired, as plaintiff's counsel said. He indicated that he was fired from KFC. But for McDonald's, at page 58 of the record, plaintiff actually testified that he quit the job and he left not because of his mental impairment but because of what he deemed poor treatment and low pay. In addition, the Firewatch job, there was one occasion where he lost the job apparently, he claims, because he was oversleeping. But on other occasions, the ALJ indicated it was a temporary job and the contract simply expired. And in, I believe, August 1998, when he was on Ziprexa, he indicated that medication didn't sedate him. And he performed the Firewatch job acceptably. There's another instance during the period of alleged disability in the fall of 1999 where he worked for a couple days or a few days at Kaiser Aluminum as a pot tender, and he simply quit that job after a couple days because he said he didn't like it and didn't feel the work was for him. And this is really the essence of what the ALJ was focusing on. It's also incorporated in plaintiff's testimony at pages 65 through 70 where a plaintiff says that he could go back to work, at least part-time, part-time initially just because he would require some time to get used to work again. He felt he was drifting through life and simply hadn't found a job that he enjoyed. Well, that's understandable, and that happens with a lot of young adults, but it doesn't mean that his job search should be subsidized on the government's dime. Does the commissioner agree that the ALJ misunderstood what negative symptomology was, what that term meant, and just says, but it doesn't matter because of the other reasons, or do you dispute that there was a misunderstanding? The first thing you said. We concede that he misunderstood, but it's harmless error per Batson because of the other proper reasons the ALJ gave to reject Dr. Lenz's opinion. Another job, a third job I haven't talked about, is the dishwasher job that he had while at Olive Garden Restaurant. There's no evidence in the record at all that he was unable to perform that job. In fact, he described it as simply running a dishwashing machine, a very simple type of employment. And a related point that makes this case unique is that at Step 4, you don't even have to find that a claimant has the capability to perform full-time work. Part-time work can be sufficient at Step 4 for a non-disability finding if the claimant performed the past relevant work on a part-time basis. He found only moderate limitations, is that right? In other words, at the Step 4, he indicated that there would be only moderate limitations on his working? Correct. That's what the ALJ found, and that's consistent with what the state agency review and psychologist found as well. Dr. Nimes is the consultative examiner and plaintiff alleges an error there in rejecting his opinion, but he didn't really state any functional limitations that a plaintiff would have in working. He examined the plaintiff and talked about his schizophrenia by history, but Dr. Nimes didn't list any functional limitations. He did mention what's called a global assessment of functioning score, a GAF score, but there's no requirement in the regulations that an ALJ talk about such a score. In fact, in August 2000, the commissioner, in a comment in the Federal Register, indicated that GAF scores don't have any correlation to the severity of mental disorders. Another argument I wanted to point out, because I didn't mention it in my brief, is that the plaintiff argues for the first time on appeal that the ALJ ignored an opinion from his treatment coordinator, Ms. McKinney, but again, the plaintiff didn't raise that argument at the district court, and it's raised here for the first time on appeal. The problem with that, in addition, is that it's an opinion from an other source. Other source is qualified to give, in essence, lay testimony. Observations from such sources are valuable. But opinions, medical opinions, come from acceptable medical sources, such as Dr. Lenza, and the treatment coordinator's opinion was somewhat redundant in that regard, because Dr. Lenza, who was qualified to give the opinion, the ALJ discussed his opinion thoroughly and rejected it. So there's no error there as well. The panel has no other questions. No questions, counsel. Thank you very much. Thank you. Ms. Shagen, you have some time. Thank you. Regarding the fast food job, it is true that Mr. Floyd didn't say he was fired from his job at McDonald's. The most recent time he worked as a fast food cook was at Kentucky Fried Chicken. He was fired from that job. However, in Dr. Lenza's notes, it indicates, at Excerpts of Record 233, that while Mr. Floyd was working at McDonald's, he was getting behind due to problems with pace, which is one of the documented problems that he has due to his mental impairment. What is the problem with pace? He can't cook the food fast enough? He couldn't keep up. How do we know that's a product of mental illness and he's just not cut out to work at that restaurant? He was experiencing lethargy due to the antipsychotic medications. When he wasn't taking higher doses of the antipsychotic medications, he was having problems with violent outbursts, not getting along with co-workers. The medicine slowed him down? The medicine slowed him down and made him sleepy. And regarding Dr. Niemes or Dr. Niemes, I'm not sure how it's pronounced, the reason that he didn't identify more functional limitations was because he thought the record should be further developed. He did identify a very low global assessment of functioning score, a GAF score of 50, which corresponds to serious impairments. And the commissioner is now arguing that, oh, that doesn't really mean anything. However, the administrative law judge didn't make that argument. He didn't give any reasons for rejecting this opinion and didn't acknowledge the development that was necessary. And so for that reason, it would be a post hoc rationalization on the part of the government to try to argue this now. And I think that's it, if there are no additional questions. Thank you. No questions, counsel. Thank you very much. The case just argued will be submitted for decision, and the court will adjourn. Hear ye, hear ye. All those having had business before this honorable court, the United States Court of Appeals for the Ninth Circuit shall now depart, and this court now stands adjourned.
judges: O'scannlain, Silverman, Gould